NOT RECOMMENDED FOR PUBLICATION
FILE NAME: 21A0167N.06

Case No. 19-2351

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **MEAT TOWN INC.,** | ) | **FILED**<br>Mar 30, 2021<br>DEBORAH S. HUNT, Clerk |
| *Plaintiff-Appellant*, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ON APPEAL FROM THE** |
| **SENTINEL INSURANCE COMPANY,** | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE EASTERN** |
| *Defendant-Appellee.* | ) | **DISTRICT OF MICHIGAN** |
| | ) | |

**Before: BATCHELDER, MOORE, and ROGERS, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** In this insurance coverage dispute, the district court ruled for the defendant insurance company on cross-motions for summary judgment, ending the action. The plaintiff appeals that summary-judgment ruling as well as the district court's ruling on a discovery-sanctions motion. For the reasons that follow, we AFFIRM.

**I.**

This is a lawsuit by a Michigan company against its out-of-state insurer, filed in Michigan and removed to federal court under diversity jurisdiction. Michigan law governs the interpretation and application of the insurance policy. *Hantz Fin. Servs., Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 664 F. App'x 452, 456 (6th Cir. 2016). Under Michigan law, "[a]n insurance policy is similar to any other contractual agreement." *Hunt v. Drielick*, 852 N.W.2d 562, 565 (Mich. 2014). "A fundamental tenet of [Michigan law] is that unambiguous contracts . . . must be enforced as written . . . according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich.

2005) (citation omitted). Consequently, while "exclusionary clauses in insurance policies are strictly construed in favor of the insured, . . . it is impossible to hold an insurance company liable for a risk it did not assume, and, thus, clear and specific exclusions must be enforced." *Hunt*, 852 N.W.2d at 565-66 (editorial marks, quotation marks, and citations omitted).

The insurance policy in this case voids all coverage if the insured conceals or misrepresents material facts concerning its claim; e.g., commits fraud. Under Michigan law, to effectuate such a provision, the insurer must prove that the claim was (1) knowingly false or made in reckless disregard for the truth, and (2) material, such that the insured intended to induce the insurer to act upon it. *Sinkfield v. State Farm Ins.*, 580 F. App'x 323, 326 (6th Cir. 2014) (quoting *Rayis v. Shelby Mut. Ins. Co.*, 264 N.W.2d 5, 8 (Mich. Ct. App. 1978)); *see also West v. Farm Bureau Mut. Ins. Co.*, 259 N.W.2d 556, 557 (Mich. 1977). "Furthermore, under Michigan law, it matters not that the fraud [was] perpetrated in connection with only a portion of the loss claimed by an insured." *McKellar v. State Farm Fire & Cas. Co.*, No. 14-cv-13730, 2016 WL 304759, at *9 (E.D. Mich. Jan. 26, 2016) (relying on *Martin v. Farm Bureau Gen. Ins. Co.*, 2008 WL 1807940 (Mich. Ct. App. Apr. 22, 2008) ("To void the policy, the insured is not required to lie about all of his or her losses; rather a lie related to a single loss operates to void the policy.")).

This appeal stems from the district court's grant of summary judgment to the insurer on the basis that the insured's misrepresentations voided the policy under its clear terms. We review a grant of summary judgment de novo. *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To overcome summary judgment, the nonmoving party must "present sufficient evidence to permit a reasonable jury to find in its favor." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 805 (6th Cir. 2020) (citation omitted). We commonly refer to this as "requiring

2

more than a 'scintilla' of evidence," and emphasize that "a party may not avoid summary judgment by resorting to speculation, conjecture, or fantasy." *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (quotation marks and citations omitted).

Just like the district court, we view the evidence "in a light most favorable to the [nonmoving] party. . . , giving that party the benefit of all reasonable inferences." *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019). But we can affirm on any basis supported by the record. *Keathley v. Grange Ins. Co.*, 803 F. App'x 907, 912 (6th Cir. 2020) (citing *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield*, 722 F.3d 861, 865 (6th Cir. 2013)).

## II.

Meat Town Inc. was a retail butcher and grocer in Detroit, Michigan. Because it was predominantly a butcher shop, selling a large volume of perishable products, its entire retail space was refrigerated and was laid out with three large, glass cases that displayed fresh meat and served as customer-service counters, two large freezers that displayed frozen meat, and shelves for display of other grocery items. In September 2015, Meat Town renewed its "Business Owner's Policy" with Sentinel Insurance Company, Ltd., to insure the real property, fixtures and equipment, inventory, and business interests against loss due to, among other things, vandalism or fire.[1]

On December 24, 2015, Meat Town filed a claim under this policy for losses arising from an afterhours break-in, robbery, and vandalism that occurred on November 10, 2015, which is referred to as the "Vandalism Event."[2] On March 7, 2016, Meat Town filed a second, separate

---

[1] Sentinel is a wholly owned subsidiary of The Hartford Financial Services Group, Inc. (commonly "The Hartford"), a publicly traded financial holding company. In the record, Sentinel is occasionally depicted as The Hartford, such as on letterhead or in certain reports. There is no meaningful difference for our purposes.

[2] The police responded to the Vandalism Event, but the record does not contain a police report or other documentation of a criminal investigation. Meat Town timely notified Sentinel of the Vandalism Event on November 11, 2015, though it did not file a formal claim until later.

claim for losses arising from a fire on December 19, 2015, which is referred to as "the Fire."[3]
On October 4, 2016, Meat Town's President, Pete Demopolis, signed, with notarization, a "Sworn Statement in Proof of Loss," claiming $487,879 in loss and damages from the Vandalism Event.[4] The Statement was submitted to Sentinel with a "Summary of Loss" and hundreds of pages of supporting documentation. The record also contains a separate "Summary of Loss" for the Fire, totaling $473,310 and itemizing those damages both generally, in a one-page summary, and specifically, in a 22-page, computer-generated worksheet. The record does not contain an equivalent "Sworn Statement in Proof of Loss" for that claim for the Fire.[5]

Sentinel was suspicious that the claims were fraudulent and began an investigation, which eventually turned those suspicions into convictions that the claims were fraudulent. But when Sentinel had not resolved its claim by November 2017, Meat Town became concerned that two-year statute of limitations was about to expire, so it sued Sentinel in Michigan state court, alleging breach of contract and seeking a declaratory judgment. Sentinel, a Connecticut corporation, removed the case to federal court based on diversity jurisdiction. In August 2018, while discovery was underway, Sentinel sent Meat Town a four-page letter denying both claims. The letter quoted several provisions from the policy, with the most pertinent for present purposes being:

> This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning: . . . [] The Covered property; [] Your interest in the Covered Property; or [] A claim under this policy.

---

[3] This Fire was ultimately determined to have been arson. Meat Town had not reopened for business after the Vandalism Event, so the arson was committed while the building was unattended.

[4] The parties frequently refer to an intermediate and incomplete "Summary of Loss," totaling $307,815 (with the deductible subtracted out), as *the* summary of loss for the Vandalism Event. That statement is undated, but, based on other information, was likely submitted to Sentinel in late January 2016. Because that statement is undated and unsworn, we will rely on the dated, signed, sworn, and notarized statement totaling $487,879.

[5] On November 11, 2015, the day after the Vandalism Event, Meat Town hired a private claims-adjusting company named Claims Consultants International, LLC ("CCI"), which prepared and submitted to Sentinel both claims and the associated proofs of loss for each. Because CCI was acting as Meat Town's authorized representative, and because CCI is not a party to this action, we will refer only to Meat Town and make no further reference to CCI.

Form SS00051008, "Common Policy Conditions" Sec. C. The letter listed eight reasons for the denial, including Sentinel's determination that Meat Town had "committed fraud and false swearing," "made misrepresentations of material facts," and "concealed material facts." Consequently, Sentinel declared the policy void and denied any coverage for any "claim[s] arising out of the alleged vandalism, theft, and the fire." Specifically, Sentinel believed, based on its investigation, that Meat Town had, among other things, made certain claims of loss that were knowingly, irrefutably, and indefensibly false and fraudulent.

**A.**

As represented in the district court, three significant things happened at Meat Town on Tuesday, November 10, 2015. Chronologically: (1) four suppliers made substantial deliveries; (2) the local utility company turned off the electricity; and (3) the Vandalism Event occurred.

Meat Town told Sentinel that, before noon on November 10, it received at least four deliveries of products: Kap's Wholesale Food Services, Inc. made a massive delivery of over 12 tons of meat (almost 7,000 lbs. of loin back rib, over 13,000 lbs. of chitterlings, and 5,500 lbs. of hog maws) at a total cost of $42,992.27; Quality Meats & Culinary Specialties delivered 735 lbs. of meat at a cost of $2,840.45; United Meat Co. delivered 1,320 lbs. of meat at a cost of $4,733.60; and Douglas Mushel delivered 400 lbs. of seafood (shrimp and crab legs) at a cost of $5,840.00. Meat Town provided Sentinel with copies of invoices or bills of lading for each of these four deliveries as proof of both its receipt of them on November 10 and the amounts it paid for them.

To provide some perspective, the 12-ton Kap's order comprised 186 packages of loin back rib, 335 packages of chitterlings, and 140 packages of hog maws. The other orders, while much smaller, were more diverse, with the Quality Meats order comprising separate packages of intestines, beef spare-ribs, fresh cheek meat, pork tenderloins, veal sliders, back ribs, sliced gyro

meat, and chicken leg quarters.[6] The United Meat Co. order comprised 16 different products. Meat Town told Sentinel that, when the deliveries arrived on November 10, an employee unloaded and unpacked them into display cases and freezers. According to Meat Town's claim, most of the meat from these deliveries was stolen (i.e., 130 cases of loin back ribs, 295 cases of chitterlings, and 95 cases of hog maws, totaling $33,298)[7] and the rest ruined along with the vandalized display cases and freezers, where this meat was found covered in glass after the Vandalism Event.

Next, at just before noon that same day (Tuesday, November 10, 2015), the electric utility company shut off Meat Town's electricity.[8] Neither Meat Town's owner, Peter Demopolis, nor its manager, Alan Gluck, was at Meat Town when the electricity went off, but the floor manager called them and was told to "sit tight." After about 30 minutes of sitting in the dark, the floor manager decided to close the store. The exterior doors had roll-down steel covers and the building had a security system, monitored by Central Alarm and Signal Inc., with alarms on the doors and motion detectors throughout the interior. The floor manager locked the store, activated the security system, and left with the other three employees. That was at approximately 12:30 p.m.

Obviously, the deliveries had to have been received before then.[9] And, while Meat Town had four employees working that morning, only one was available for deliveries; the other three were the floor manager, a cashier, and a butcher. So, a single employee would have unloaded, unpacked, and stocked 13 tons of meat before Meat Town closed at 12:30 in the afternoon.

---

[6] As litigation proceeded, Meat Town appeared to concede that the Quality Meat's deliveries likely occurred in September or October, and suggested that the incorrect date presented in the Summary of Loss might have been related to its practice of freezing and storing products purchased from Quality Meats to sell at a later time.

[7] Meat Town's total claim of loss due to theft from the Vandalism Event was $63,259. In addition to the 10 tons of loin back ribs, chitterlings, and hog maws from Kap's, Meat Town also claimed that the thieves had stolen 22 cases (1,166 lbs.) of corned beef and 53 cases (3,509 lbs.) of trim beef exports. This is a total of over 12 tons of meat removed from the store by hand.

[8] The electricity remained off for six days. Meat Town did not reopen for business after the Vandalism Event.

[9] At his deposition, the floor manager did not recall any deliveries that day. And, as mentioned, Meat Town later conceded that the Quality Meats delivery likely did not occur on that day.

Demopolis said a single employee could have done so because Meat Town had an electric lift at its back dock and the meat could have been stored on the floor, outside of the display cases or freezers, even overnight, because it takes a long time for it to thaw. But because Meat Town had no electricity during the Vandalism Event, the thieves—unlike the Meat Town employee—would have had to move this meat without the use of the electric lift and out through the customer entryway because that lift blocked the back door and loading dock.

According to the security company, the Vandalism Event began at 5:25 p.m., when the vandals breached the front door and triggered the alarm. The security company contacted the police and left a voice message for Demopolis. The vandals triggered the motion detectors and alarms somewhat erratically for the next 30 minutes, with the system recording the last movement inside the store at 5:56 p.m. According to Meat Town, during that 31 minutes, the vandals had stolen over 13 tons of meat, smashed seven glass display cases and freezers, destroyed scales and equipment, toppled the cash register, trashed the office, and even damaged the overhead ceiling evaporators. When Demopolis arrived a little after 7:00 p.m., the police were outside. Because the roll-down steel door covers had not been damaged, Demopolis was able to purchase padlocks at a nearby hardware store and re-secure the building.

**B.**

Meat Town never reopened for business after the November 10 Vandalism Event and, on December 19, 2015, while Meat Town's landlord was in the process of evicting Meat Town from the property, an arsonist set the Fire. Apparently, police responding to a robbery at the Family Dollar store next door heard the alarm, saw the smoke, and reported the Fire. The Fire was severe and rendered the property unusable, burning the interior of the building, fixtures, equipment, remaining merchandise, and office records.

**C.**

Meat Town eventually filed two separate insurance claims with Sentinel, claiming $487,879 in loss from the Vandalism Event and $473,310 from the Fire. Sentinel was suspicious and conducted an investigation. Ultimately, Sentinel concluded that Meat Town's claims were not merely erroneous or exaggerated, but were knowingly, irrefutably, and indefensibly fraudulent.

As a ready example, Sentinel pointed to the November 10 delivery from Kap's. Meat Town claimed that 56.6 packages of "loin back rib" from that delivery had been placed for display in specific display cases; those cases were vandalized; and the packages of meat had to be discarded because they were covered with broken glass and debris. Similarly, 65 packages of chitterlings (pig intestine) and 89 packages of hog maws (pig stomach), all from Kap's, had been in the vandalized freezers and had to be discarded because they were "covered with glass." Meat Town provided copies of two invoices from Kap's as proof of its receipt of that meat on November 10, and the prices it had paid Kap's for it, representing about $12,446 of the total $42,992 on the invoices. But Kap's controller, Allen Cohn, attested in an affidavit that those orders were cancelled "without sale or delivery to Meat Town," such that Meat Town neither paid for nor received "any of the products reflected on th[ose] invoices." Meat Town provided no other evidence that it had received that meat. Rather, Meat Town's manager, Alan Gluck, answered in a sworn declaration that, because its records were destroyed during the Fire, Meat Town's only recourse had been to request documentation from its vendors; that Kap's had provided Meat Town with those invoices; and that Meat Town had merely passed those invoices on to Sentinel in "good faith," so "if there is any error in the invoice[s], it is Kap's [error], not Meat Town's."

But Sentinel had another example. Among its claims of loss for the meat discarded from its vandalized display cases and freezers, Meat Town claimed $8,739 for the meat received from Quality Meats on November 7 and 10, 2015. Meat Town supported this claim with copies of four

bills of lading from Quality Meats. Significantly, none of those bills was dated. The President/ CEO of Quality Meats, Jeff Davis, attested in an affidavit that Quality Meats did not sell or deliver *any* meat to Meat Town in November 2015. When Quality Meats produced its copies of those same four bills, each clearly depicted a date (three dated September 12 and one dated October 3). A comparison of the respective copies revealed that Meat Town's copies had no visible dates, but instead had an unmistakable white space where the date was located on Quality Meats' copies.

To be sure, these were just two ready examples of Meat Town's making particular claims and supporting them with specific descriptions of events and conditions that were not merely untrue, but which must have been knowingly fabricated. Sentinel accused Meat Town of fraud in almost every aspect of the claims. Invoking the fraud provision in the policy, Sentinel denied the claims and Meat Town sued, albeit in reverse order—Meat Town had sued Sentinel before Sentinel denied the claims, but the procedural posture of the lawsuit was ultimately the same.

**D.**

On November 5, 2018, both sides moved for summary judgment. The crux of Sentinel's argument was an elaboration on its denial letter, conveniently summarized as:

> Investigation of [the] insurance claims made in this case and information obtained in discovery, confirmed that Meat Town's representatives made repeated and egregious misrepresentations in support of their insurance claims related to nearly every aspect of [the] alleged losses. The evidence has established [t]hat much of the basis of Meat Town's claims are demonstrably untrue.
>
> Any material misrepresentation made in support of a false claim constitutes fraudulent proof of loss sufficient to void the entire policy, both under the terms of Sentinel's policy and Michigan law. Accordingly, Meat Town has no coverage for any of the losses claimed in this case.

Sentinel pointed to the claims for the glass-tainted meat, as described in the two foregoing examples, and the evident misrepresentations associated with those claims. Sentinel also challenged Meat Town's claims of vandalism to the ceiling evaporators, refuting those claims with an expert report that concluded that the ceiling evaporators had not been damaged during the

9

Vandalism Event. Sentinel produced evidence from the electric utility, confirmed in depositions of Meat Town employees, that, due to nonpayment, the utility company had shut off Meat Town's electricity at about 12:30 p.m. on the day of the Vandalism Event and it remained off for six days. Sentinel offered this as proof of Meat Town's financial distress and motive for insurance fraud, and argued that (1) perishable products remaining after the Vandalism Event would have spoiled for lack of refrigeration long before the Fire, so Meat Town's claims for meat and cheese lost in the Fire were knowingly fraudulent, and (2) the electric lift in Meat Town's back loading dock would not have been operational without electricity, leaving no feasible means for any large volume of meat (much less 13 tons) to have been stolen, further rendering that claim fraudulent.

Next Sentinel produced its evidence that Meat Town did not own the real property or fixtures for which it was seeking reimbursement, but that it was only a tenant. The landlord owned and insured the real property and fixtures, and Meat Town had no insurable interest in them, thus negating Meat Town's claims for loss to the real property and fixtures. Moreover, the landlord had been in the process of evicting Meat Town prior to the Fire, and had the court order to prove it, so Meat Town was not even a tenant. Finally, Sentinel argued that Meat Town had also voided the policy by failing to cooperate with its investigation, failing to produce information requested, and failing to protect its property from further damage after the initial losses occurred.

Meat Town cross-moved for summary judgment, arguing that its claims were indeed covered under the policy, that it had cooperated fully with Sentinel's investigation and provided all requested information (comprising "thousands of pages"), that it had truthfully denied that it was evicted because that action was never completed, and that Sentinel had not proven that it had submitted any forged documentation or made fraudulent or material misrepresentations. Meat Town had moved the court to strike the aforementioned vendor affidavits as a discovery sanction, and its lack-of-proof argument was based on the presumption that the court would agree. In its

opposition to Sentinel's motion for summary judgment, however, Meat Town addressed the vendor affidavits directly, arguing that the Kap's invoices at issue were received from Kap's, via fax after the Vandalism Event, and Meat Town had merely passed them on to Sentinel, as received, in innocent ignorance of any inaccuracy; and the missing dates for the Quality Meats bills of lading were irrelevant because Meat Town routinely froze its inventory to sell it later. In its subsequent sur-reply, Meat Town reasserted its justifications of the Kap's and Quality Meats' invoices with renewed vigor, but no additional explanation or evidence. Thus, it is noteworthy that Meat Town never addressed, explained, or provided any evidence to the district court to support: (1) its contention that it had actually received and possessed the meat from Kap's, and that its employee had unpacked and parceled out that meat into certain display cases and freezers such that a specific number of packages (or partial packages) were stolen and another number of packages were discarded because they were later found in the cases covered in shattered glass; or (2) its claim that it purchased and received the Quality Meats products on the specifically contrived dates of November 7 and 10, despite the evidence that it had actually received three of the purchases on September 12 and the fourth on October 3, and despite the suspicious absences of any dates on the copies of the Quality Meats bills that it submitted to Sentinel.

In ruling on the competing motions, the district court found that Meat Town had made material misrepresentations in its claims to Sentinel, that those misrepresentations voided the policy, and that Sentinel—and not Meat Town—was entitled to summary judgment. *Meat Town v. Sentinel Ins. Co., Ltd.*, 413 F. Supp. 3d 671, 671 (E.D. Mich. 2019). The court explained that, under the terms of the policy, as well as Michigan law, the policy was void if the insured made a material representation, either knowingly or recklessly, with the intent that the insurer would act on it. *Id.* at 673 (relying on *Nahshal v. Fremont Ins. Co.*, 922 N.W.2d 662, 675 (Mich. Ct. App. 2018)). The court determined that Meat Town's claims of loss for the Kap's and Quality Meats'

orders were enough to satisfy this test and declined to analyze Sentinel's other accusations. *Id*. at 674. Concerning the Kap's products, the court recognized that Meat Town had told Sentinel that, on November 10, it received a delivery of 186 packages of back rib, which its employee divided "throughout the store (some in the east counter, some in the north freezer, the remainder stolen)"; that is, Meat Town falsely represented, in compelling detail, that those packages "of loin back rib *were seen in Meat Town's facility after* the robbery and vandalism," some "in or around the east counter and [some others] in the north freezer 'covered with glass.'" *Id.* at 674-75 (record citations omitted; emphasis added). According to the district court, this misrepresentation was "not akin to simply submitting invoices provided by Kap's," rather "[i]t stands out as an attempt to make Sentinel believe that the back rib had been delivered (when, in fact, it had not been)." *Id*. at 675. The court recognized the same for the chitterlings and hog maws. *Id*.

> In short, the [c]ourt finds that every reasonable jury would find that Meat Town intentionally misrepresented to Sentinel that when it . . . did the post-vandalism assessment, it saw the loin back rib, chitterlings, and hog maw identified in the [] invoices in at least two different locations in the store, covered in glass.

> The Court further finds that every reasonable jury would find the intentional misrepresentation to have been material to the insurance claim. . . .

> Accordingly, based on the misrepresentations Meat Town made to Sentinel about meat sourced from Kap's, every reasonable jury would find that Sentinel has the right to void the insurance policy.

*Id*. at 675-76. Even though the false Kap's claims were enough to decide the case, the court added the Quality Meats analysis to "bolster" its conclusion. *Id*. at 676. The false representation about Quality Meats was Meat Town's claim that it purchased that meat on November 7 and 10, when, in reality, Quality Meats had delivered the last of those orders on October 3rd. *Id*. at 677.

> Comparing the submitted copies [of Quality Meats' bills] with the copies in possession of Quality Meats strongly suggests that Meat Town removed the delivery date (by white out or similar artifice) from the copies it submitted to Sentinel. And while the delivery date is not the same as the date of purchase . . . , that Meat Town apparently went through the trouble of stripping the delivery date from the [copies] submitted to Sentinel strongly suggests that Meat Town knew the delivery date would make it less likely that Sentinel would pay its claim.

12

> [Also] . . . [b]y fabricating the date of purchase, [Meat Town] made it more difficult for Sentinel to verify the claimed loss. . . . Sentinel had no way of knowing that what it should have been looking for was sales to Meat Town in September and October 2015. Moreover, the September and October delivery dates leave open the possibility that much of the Quality Meat products included in the Summary of Loss had in fact been sold by the time of the robbery and vandalism. That possibility would certainly have been relevant to Sentinel.

*Id*. at 677 (record citations omitted). In the court's view, Meat Town had raised no genuine dispute of material fact because, "if presented with the summary-judgment record, every reasonable jury would find that Meat Town intentionally, or at least recklessly, made material misrepresentations on its Summary of Loss with the expectation that Sentinel would pay the claimed amount." *Id*. Thus, the court held, as a matter of law, that Sentinel was entitled to declare the entire policy void and it granted summary judgment to Sentinel on that basis. *Id*. at 678.

**E.**

Meat Town moved the district court to reconsider, arguing that summary judgment was improper because it had raised three genuine questions of material fact for a decision by a jury; namely, (1) whether Meat Town intended to deceive Sentinel, (2) whether the misrepresentations were material, and (3) whether those were even misrepresentations; i.e., whether or not Kap's had actually delivered the meat listed on the invoices that Kap's disavowed. On the intent issue, Meat Town argued that "all that is required" to survive summary judgment and put the question before a jury "is a denial of any intent to defraud." On the materiality issue, Meat Town argued that any misrepresentation based on the Kap's (or Quality Meats) products was not material because that constituted such a small percentage of the overall insurance claim. Finally, Meat Town argued that it had produced evidence upon which a jury could conclude that Kap's had delivered the meat despite the disavowed invoices.

In denying this motion, the district court began its analysis by correcting Meat Town's misconception about the standard for analyzing and granting summary judgment:

13

> [J]ust because a party disputes a question of fact does not mean that there is a *genuine* dispute over a question of fact. For there to be a genuine dispute warranting a trial, a party must put forth enough evidence for a reasonable jury to answer the question in its favor. So it is not sufficient for a party to simply dispute a question of fact as Meat Town suggests. Instead, once the moving party has put forth evidence that would convince all reasonable juries to answer a fact question in its favor, the non-moving party must put forth evidence that would permit at least one reasonable jur[or] to [instead] answer in its favor.

*Meat Town v. Sentinel Ins. Co., Ltd.*, No. 17-13801, 2019 WL 5445831, at *2 (E.D. Mich. Oct. 24, 2019) (citing and relying on *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)). The court also pointed out again that, while Meat Town was insisting that it did not *intend* to deceive Sentinel, the scienter requirement also included reckless disregard for the truth. *Id.* at *4.

On the intent issue, the court considered Meat Town's argument that—even accepting that it did not receive the Kap's products—its claims that it had received those products and seen them in its shattered display cases covered in glass and debris were not deceitful but simply mistaken, due to the dark and disarrayed condition of the store. The court expressed doubt about this theory as a practical matter but looked for actual evidence to support it in Meat Town's reply to the Kap's affidavit, i.e., the sworn declaration of Alan Gluck, Meat Town's manager. The court explained that: (1) Gluck "never averred that products from one vendor were mistakenly identified as products from Kap's," *id.* at *4; (2) Meat Town's three references to this declaration were phrases taken out of context and, when read in context, they did not disclaim either the misrepresentation or its intent, *id.* at *5; and (3) the issue was whether the specific meat was "seen in various locations in the store 'covered with glass,'" not the legitimacy of the disavowed invoices, *id.* The court concluded that Meat Town had pointed to no evidence by which a reasonable juror could overcome the inference that Meat Town had intentionally or recklessly misrepresented to Sentinel that it had received the Kap's products and seen them in its cases, covered in glass and debris.[10] *Id.*

---

[10] The court also rejected Meat Town's arguments about Quality Meats: that the dates might have been missing from its copies due to the use of carbon-copy paper, and that "a reasonable jur[or] could find that the incorrect

On the materiality issue, the court defended its prior determination by explaining that "Sentinel could void the policy if there was an intentional, material misrepresentation in *either claim*" and, considering the Vandalism Event claim, the Kap's products constituted almost 15% of that claim, which would be material to any reasonable juror. *Id*. at *7 (emphasis added). And Meat Town had pointed to no evidence that would convince a reasonable juror otherwise.

Finally, on the question of whether Kap's did or did not deliver the meat listed on the disavowed invoices, the court carefully considered the four pieces of evidence that Meat Town pointed to as proof that the Kap's products were actually delivered: (1) the deposition testimony by Meat Town's owner, Peter Demopolis; (2) the proof-of-loss submission; (3) the Kap's invoices; and (4) the sworn statement by Meat Town's manager, Alan Gluck. The court rejected the Demopolis deposition because, "in its summary-judgment briefing, Meat Town quoted the very same testimony from Demopolis and asserted that he was not testifying about the Kap's delivery specifically, but about deliveries to Meat Town generally . . . and did not himself witness this specific delivery." *Id*. at *8 (quotation marks and citation omitted). In fact, a fair and plain reading of Demopolis's deposition testimony demonstrates that he simply *did not know* whether the Kap's order was delivered. The court rejected Meat Town's reliance on the proof-of-loss submission because that is "the very statement" that Sentinel accused of being false. *Id.* More to the point, that assertion (or representation) is not *evidence* upon which a jury could find for Meat Town, it is the heart of the dispute: because Sentinel produced evidence that the proof-of-loss statement was false (i.e., a misrepresentation), for Meat Town to survive summary judgment, it had to produce some further admissible evidence that could prove that it was not. Similarly, the court rejected

___

purchase date was an innocent mistake." *Meat Town*, 2019 WL 5445831, at *6. The court explained that "even if the bills of lading were drafted on carbon paper, that does not explain why Meat Town's copies lacked the delivery date but Quality Meats' copies did not," and added that Meat Town had still "provide[d] no explanation as to why it [would mistakenly] believe[] the goods had been purchased on November 10." *Id.* (quotation and editorial marks omitted). Of course, even this ignores the peculiar misrepresentation of two separate false dates: November 7 and 10.

Meat Town's attempted reliance on the Kap's invoices themselves because Kap's controller attested that the items on those invoices were never sold or delivered to Meat Town. *Id.* Finally, considering the Gluck affidavit, the court found that Meat Town had taken excerpts out of context to misrepresent that testimony; read in context, Gluck averred that Meat Town's claims of loss for the Kap's products were based on its good faith reliance on the invoices received from Kap's because it had not actually known what it had received from Kap's. *Id.* The Gluck affidavit does not state that Meat Town received the Kap's products. Moreover, the court recognized, Meat Town produced "no sworn testimony from anyone who accepted delivery of Kap's meat on November 10, 2015,[11] or who placed the meat in the referenced locations, or who inventoried the store after the robbery." *Id.* Nor did Meat Town produce any proof of payment to—or clear demand for payment from—Kap's for this $43,000 order. In sum, Meat Town failed to produce or point to any evidence upon which a juror could find in its favor.

## III.

In this appeal, Meat Town presses the same three arguments, with some amplification, that it made to the district court in its motion for reconsideration. We are not persuaded.

## A.

Meat Town proposes that it could prove, and a reasonable jury could find, that Kap's actually did deliver to Meat Town on November 10 the products listed on the disavowed invoices. Thus, Meat Town argues that summary judgment was improper because it has raised a genuine dispute of material fact for decision by a jury as to whether Kap's did or did not deliver those products. As the district court explained in denying Meat Town's motion for reconsideration, summarized above, this argument is untenable. There is no genuine dispute over this issue.

---

[11] Recall that, at his deposition, the Meat Town floor manager who was managing the store, and who closed and locked up after the power outage, did not recall *any* deliveries that day.

In fact, scrutiny of Meat Town's briefing here demonstrates that this argument is baseless. For example, in its opening brief to this court, Meat Town asserts:

> Meat Town and Kap's were still exchanging emails about [the disavowed invoices] weeks after the burglary, with Meat Town seeking verification of the delivery, and, importantly, with *Kap's responding*, apparently confirming delivery and still seeking payment for that delivery. (R.31-2, PageID. 1662-1665.) Why would Kap's still be seeking payment for this product if it was never delivered?

That record citation, "R.31-2," is "Exhibit A" to Meat Town's motion for reconsideration in the district court and comprises four pages: two one-page emails and copies of the two disavowed Kap's invoices. The first email was from Meat Town to Kap's at 1:39 p.m. on January 11, 2016. That email does not show "Meat Town seeking verification of the delivery," as Meat Town contends. That email says, in its entirety: "Hi, the insurance company is requesting a statement of purchases from our suppliers for the period of Jan. 2015 thru Nov. 2015. Ours burned in the fire so please email; meattown@yahoo.com. Thanks, Alan [Gluck]." The other email is the apparent reply from Kap's, at 2:58 p.m. that same day. Its subject line says, "Scan from Kaps Wholesale Food," it has an attachment titled "Scan 001.pdf," and the text says only: "Please open the attached document." Nothing from the content or context of that email could reasonably be construed as Kap's actively "still seeking payment for that delivery." From that response, the only way to infer that Kap's was "confirming delivery and still seeking payment for that delivery," as Meat Town contends, would be to find that the attached Scan 001.pdf compels that inference.

Because the final two pages in that four-page record citation are the two disavowed Kap's invoices, one could reasonably assume that those two invoices comprise Scan 001.pdf. Maybe, or maybe not.[12] But, even if they do, without something more, those two invoices add nothing to support a claim that Kap's was still seeking payment for that alleged delivery. Particularly when

---

[12] Meat Town did not provide any express statement, much less an affidavit, stating that Scan 001.pdf was those two disavowed invoices. Therefore, this is conjecture, not evidence. But it is ultimately irrelevant.

the transmission of those invoices is considered in context—as an immediate response to Meat Town's request for lost documentation—no reasonable juror could conclude that those invoices represent a demand for payment, much less a clear and unequivocal demand for payment.

Meat Town's brief follows that with another unsupported claim: that photos taken by the adjuster during the post-vandalism appraisal "appear to confirm that after the burglary, there were boxes of Kap's products inside the shattered freezers. (R.31-4, PageID. 1674.)." The referenced photo, however, which depicts three glass freezer doors, all smashed, and stacks of carboard boxes inside, gives no indication whatsoever that the boxes in the photo are of Kap's products. To the contrary, a sign posted on one of the freezer doors is for "Bar-B-Q Spare Rib Tips," which is *not* one of the products from the Kap's invoices. The record contains an affidavit from the adjuster, and Meat Town's brief cited it, but nowhere in that 20-paragraph affidavit does the adjuster attest that the boxes in that photo are of Kap's products, that he took any photos of any Kap's products, that he saw any Kap's products at Meat Town during his appraisal, or that he mistook any other vendor's products for Kap's products.[13]

There is no evidence that Kap's delivered the order to Meat Town on November 10, 2015. All the evidence in the record shows that it did not. There is no genuine dispute as to that fact.

---

[13] In its reply brief, Meat Town asserted that its "representative testif[ied] to the delivery," and referred to Demopolis's deposition for support. But, as the district court made clear in rejecting this same assertion, Demopolis testified to no such thing. That testimony, as with all of Demopolis's testimony about this issue, was speculation about what *would have* or *could have* happened. Consider the pertinent excerpts: Question: "So that [order] *would have had to have* been delivered on November 10th before the power was cut of, right?" Demopolis: "Yes, yes." Question: "So where *would* these 130 cases that were stolen have been stored?" Demopolis: "Again, they *could have been* along - - behind the counters . . . ." Question: "It *would have been* [a particular Meat Town employee who] *would have been* doing all of this [unloading] on November 10th, right?" Demopolis: "Sure."

Meat Town's reply brief continued: "Meat Town produced direct and independent evidence *from the vendors themselves*, [who] initially *confirmed* the sales and deliveries." It then pointed to Kap's January 11 email (that replied to Meat Town's request for documentation), as the "direct and independent" evidence that Kap's "confirmed" the sale and delivery. As discussed in the text, that email does not support this statement.

**B.**

Meat Town argues that it raised a genuine dispute of material fact for decision by a jury concerning its alleged intent to deceive or defraud Sentinel, and that the district court improperly decided this fact question for itself in granting summary judgment to Sentinel. Specifically, Meat Town contends that the district court considered the parties' competing interpretations of the facts, decided that Sentinel was more credible, and construed the facts and evidence in Sentinel's favor. This, according to Meat Town, led the court to overstate mere inaccuracies or honest mistakes from the statement of loss to find that Meat Town intended to deceive Sentinel. Meat Town further contends that, in addition to improperly finding facts on summary judgment, the court also misapplied governing law, which—according to Meat Town's twist on an unpublished district court opinion, *Thomas v. Armed Forces Ins. Exch.*, No. 14-11441, 2015 WL 2063064, at *7 (E.D. Mich. 2015)—is that summary judgment is only permissible when the "insured is caught in an obvious lie under oath," and, reciprocally, summary judgment is forbidden when "the claimed misrepresentations are contained in the proof of loss and 'relate to the value, description, or existence of property claimed to be damaged.'" Under this construction of the law, summary judgment would be prohibited in most every case. That is not the law.

We consider whether Meat Town raised a genuine question of fact for a jury as to whether Meat Town was honestly mistaken. The controlling law here is merely the summary judgment standard, which we presented at the outset of this opinion, but to restate: once Sentinel produced evidence that would entitle it to judgment as a matter of law, summary judgment was appropriate unless Meat Town refuted that evidence. Fed. R. Civ. P. 56(a). To overcome Sentinel's motion, Meat Town had to produce or point to some evidence that would put Sentinel's evidence in dispute and "permit a reasonable jur[or] to find in its favor." *See Willard*, 952 F.3d at 805. We commonly refer to that standard as "requiring more than a 'scintilla' of evidence," and emphasize that "a party

may not avoid summary judgment by resorting to speculation, conjecture, or fantasy." *See K.V.G. Properties*, 900 F.3d at 823 (quotation marks and citations omitted).

Meat Town claimed reimbursement of about $12,500 for specific inventory—210 packages of meat, some packages distributed into partial units, totaling over 2,000 lbs.—that had to be discarded because it was covered in glass and debris. Parsing this out, the claim was that: (1) Kap's delivered this meat on the morning of the Vandalism Event, November 10; (2) during the Vandalism Event, this meat was in the display cases that were smashed and shattered; (3) in the aftermath of the Vandalism Event, Meat Town's adjuster conducted an inventory of the damage, during which he found, identified, and recorded that this particular meat was in those particular damaged cases, and further determined that this meat was unsellable or unsalvageable because it was covered in broken glass and debris; (4) during the ensuing cleanup, this meat was appropriately and necessarily discarded; and (5) the loss of that merchandise (meat) justified the reimbursement of $12,500. Regardless of the accuracy or veracity of this claim, there is no dispute that *this was Meat Town's claim*. Had Sentinel blindly accepted this claim without inquiry, it would have paid Meat Town $12,500 for merchandise (meat) received from Kap's on the day of the Vandalism Event and discarded due to glass and debris that made it unsellable.

But Sentinel did not accept this claim. Instead, Sentinel produced evidence that Kap's did not actually sell or deliver this meat to Meat Town. Because Meat Town produced no evidence to refute this, it is not a disputed fact. This is an established fact that conclusively disproves all parts of Meat Town's insurance claim: i.e., (1) Kap's *did not* deliver this meat to Meat Town, (2) Meat Town *did not* have this meat during the Vandalism Event, (3) Meat Town's adjuster *did not* see this meat in the damaged cases or determine that it was unsellable; (4) this meat *was not* discarded; and (5) this claim *is not* valid, much less justified. Keeping in mind that this was no trivial amount of meat, it was over 210 packages, the most graphic misrepresentation was, for present purposes,

the elaborate false statements that this meat was seen in the damaged cases, was covered in glass and debris, and was thereafter discarded. This would necessarily lead a jury to the unavoidable inference that those peculiar statements were knowingly false or in reckless disregard for the truth.

Because this is a reasonable inference drawn from other proven facts, Meat Town's emphatic and repeated insistence that Sentinel produced no direct proof of duplicitous intent misses the point. To survive summary judgment, Meat Town had to do more than hypothesize—via attorney briefing or argument—that these might have been inaccuracies, inconsistencies, or honest and innocent mistakes. Meat Town had to produce *some evidence*, such as an affidavit or other evidence admissible at trial, that could persuade a reasonable juror that this was a mistake that did not rise to the level of reckless disregard for the truth. But Meat Town did not produce any evidence to challenge, much less disprove, this inference and instead rested on its (attorney's) conjecture that Sentinel did not prove the absence of mistake. That is not enough. *See K.V.G. Properties*, 900 F.3d at 823.

Contrary to Meat Town's contentions, the district court did not simply deem Sentinel more credible and choose its interpretation of the facts over Meat Town's. The district court determined that Meat Town had not produced any evidence to create a genuine dispute of material fact on this issue and, therefore, could not survive summary judgment. This was not error.

## C.

Meat Town contends that the misrepresentations related to Kap's and Quality Meats were not "material" and the district court committed two errors in finding that they were. First, Meat Town argues that the losses related to Kap's and Quality Meats ($55,000 combined) constitute less than 6% of the $960,000 claimed loss for the combined Vandalism Event and Fire claims, and that the district court's 15% calculation, based on the Vandalism Event alone, was improper. Second, Meat Town argues that only a jury can decide whether that 6% is material.

21

The first thing to recognize here is that Sentinel's position was that Meat Town violated the policy by "misrepresent[ing] *a material fact* concerning . . . [t]he Covered property . . . or . . . [the] claim." *See* "Common Policy Conditions" Sec. C (emphasis added). It was not that Meat Town's misrepresentations concerned *a material amount of its overall claim.* So, this entire small-portion theory or argument, though accepted and analyzed by the district court, might be entirely irrelevant here. Sentinel argues that it may have no basis in Michigan law. *See*, *e.g.*, *Shelton v. Auto-Owners Ins. Co.*, 899 N.W.2d 744, 749 (Mich. Ct. App. Ct. 2017) ("A statement is material if it is reasonably relevant to the insurer's investigation of a claim." (quotation marks and citation omitted)); *McKellar v. State Farm Fire & Cas. Co.*, No. 14-cv-13730, 2016 WL 304759, at *9 (E.D. Mich. Jan. 26, 2016) ("[U]nder Michigan law, it matters not that the fraud be perpetrated in connection with only a portion of the loss claimed by an insured.") (citing *Martin v. Farm Bureau General Ins. Co.*, 2008 WL 1807940 (Mich. Ct. App. Apr. 22, 2008) ("To void the policy, the insured is not required to lie about all of his or her losses; rather a lie related to a single loss operates to void the policy.")); *Gillison v. State Farm Fire & Cas. Co.*, No. 12-15620, 2014 WL 3440036, at *3 (E.D. Mich. July 15, 2014) (voiding the policy based on a case in which "the Michigan Court of Appeals determined that fraud exists even if the misrepresentation constituted a small percentage of the claimed loss").

Meat Town has not argued, much less produced evidence, that $55,000 is *objectively* de minimis or immaterial. Meat Town's position is that, while $55,000 may be material to Meat Town—and Meat Town wants that money—it is immaterial to Sentinel because the amount is so small *relative* to the overall claim that Sentinel (the district court and this court) must ignore the misrepresentations, no matter how egregious. Meat Town relies on two, rather dated, cases to argue in its brief that "even if Meat Town *had* made any misrepresentations to Sentinel, and even if such hypothetical misrepresentations *had been* intentional," the jury must decide whether that

intentionally misrepresented portion of the overall claim was large enough (or too small) to be material. *See Westchester Fire Ins. Co. v. Hanley*, 284 F.2d 409, 415 (6th Cir. 1960); *West v. Farm Bureau Mut. Ins. Co.*, 259 N.W.2d 556, 557 (Mich. 1977). Not surprisingly, despite their lengthy existence, neither of those cases has ever been cited for that proposition in any subsequent opinion. That is because both of those cases, and the cases that cite to them, were about the insured's intent to defraud, not the materiality of the amount or portion of the claim.

And, under Meat Town's hypothesized scenario, in which Meat Town was *clearly culpable* because it *actually intended to defraud* Sentinel with *knowingly false claims* about the Kap's order, those misrepresentations would void the policy even under the case law that Meat Town cites:

> Where an insurance policy provides that an insured's . . . misrepresentation, fraud, or false swearing voids the policy, the insured must have *actually intended to defraud the insurer*. The effect of this rule is that a false claim regarding a small portion of the loss may not result in forfeiture of the entire coverage *unless the insured is shown to be clearly culpable*.

*West*, 259 N.W.2d at 557 (citations and footnote omitted; emphasis added). Nothing in either of these cases, any case that cited them, or any case that we have identified in our research, supports the contention that a knowing, intentional, and "clearly culpable" misrepresentation by the insured cannot satisfy a policy's fraud provision unless the jury finds the amount sufficiently large.

## IV.

We review for an abuse of discretion a district court's decisions concerning Federal Rule of Civil Procedure 37(c)(1), which covers discovery violations and associated sanctions. *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015). A district court abuses its discretion when its "decision is based on an erroneous conclusion of law," its factual "findings are clearly erroneous," or its "decision is clearly unreasonable, arbitrary or fanciful." *McCarthy v. Ameritech Publ'g, Inc.*, 763 F.3d 488, 491 (6th Cir. 2014) (quotation marks and citation omitted). That is, we will find an abuse of discretion only when we have "a definite and firm conviction that the [district] court

committed a clear error of judgment." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 218 (6th Cir. 2019) (quotation marks and citation omitted).

While discovery was underway in this case, Sentinel obtained affidavits from several nonparties, including some of Meat Town's vendors, notably Kap's and Quality Meats, to which we have referred extensively. Specifically, Sentinel obtained these affidavits in June and July 2018, but did not provide them to Meat Town, as continuing discovery, until November 5, 2018, just four days before it moved for summary judgment. Meat Town moved the district court to strike the affidavits as a sanction for a presumed discovery violation.[14] The district court explained that Rule 37 gave it "discretion to fashion a remedy other than striking the affidavits" and determined that "striking the affidavits would be too harsh a remedy." *Meat Town v. Sentinel Ins. Co., Ltd.*, No. 2:17-cv-13801, 2019 WL 2523545, at *2 (E.D. Mich. June 19, 2019).

Meat Town had claimed that the delayed production of that discovery was prejudicial because the delay prevented it from "depos[ing] the affiants or gather[ing] countervailing evidence in the short time it had to [respond] to Sentinel's summary-judgment motion." *Id.* The district court disagreed, recognizing that Meat Town had been aware of the affidavits and their substantive assertions since at least October 2nd and that, despite its "claims that it had little time to obtain evidence to address the affidavits, [it had] in fact submitted an affidavit from its manager addressing the affidavits." *Id.* Nonetheless, the court modified its scheduling order to allow Meat Town to depose the affiants and file a sur-reply to Sentinel's summary-judgment reply (and allow Sentinel to file a sur-sur-reply). *Id.* at *3. But it did not strike the affidavits. *Id.*

Nothing in the district court's decision was "based on an erroneous conclusion of law" or "clearly erroneous" findings of fact. *See McCarthy*, 763 F.3d at 491. Because the court explained

---

[14] Sentinel argues that these affidavits were not subject to mandatory discovery or continuing discovery obligations because they were testimonial and attorney work product. As support, Sentinel relies on several district court opinions, mostly from out of circuit. The district court was not persuaded, but we need not decide this issue.

the basis for its decision, the decision was not "arbitrary or fanciful." *See id.* And that basis was not "clearly unreasonable." *See id*. On its face, that decision was not an abuse of discretion.

Meat Town argues that the district court's refusal to strike the affidavits and its alternative ruling "effectively ensured that Meat Town could not possibly rebut the undisclosed witnesses' testimony and, worse, the [c]ourt also allowed Sentinel to attach and rely upon *additional* undisclosed documents from those witnesses in the sur-sur-reply," namely, testimony about Kap's use of tri-colored invoices. But the district court did not rely on this testimony, or even mention this topic, and neither do we. This is irrelevant.

Meat Town's real complaint has nothing to do with the affidavits, but is merely a repetition of its primary arguments that "Sentinel persuaded the [c]ourt, without presenting evidence on the point that Meat Town 'absolutely knew' that it did not truly receive the disputed Kap's products," and Sentinel produced "no evidence that Meat Town manipulated or altered the Quality Meats records in any way," but "the [c]ourt effectively adopted Sentinel's conclusions as its own." As we have already explained, the court did not just accept Sentinel's version of the evidence concerning the nonexistent Kap's delivery; the court found that Meat Town had not produced any evidence to prove that Kap's had delivered the order and, therefore, that question was not in dispute. For what it's worth, the same is true for the Quality Meats bills of lading: Meat Town produced no evidence to explain how or why its copies were missing the dates, thus failing to dispute the unmistakable inference that Meat Town had removed them.

While Meat Town contends that the district court prevented it from rebutting Sentinel's sur-sur-reply, it has had every opportunity to do so here and has neither pointed to any rebuttal evidence that it has produced (or could produce) nor presented any argument that would put those inferences, necessarily drawn from Sentinel's evidence, into reasonable dispute.

**V.**

For the foregoing reasons, we AFFIRM the judgment of the district court.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** Because a genuine issue of material fact remains about whether Meat Town's misrepresentations to Sentinel Insurance Company ("Sentinel") were intentional or reckless, I would hold that summary judgment is improper and would reverse and remand for further proceedings. Respectfully, I dissent.

Michigan law has historically reserved for the jury the question of intent to defraud. *See West v. Farm Bureau Mut. Ins. Co. of Mich.*, 259 N.W.2d 556, 557 (Mich. 1977); *Cooper v. Firemen's Ins. Co. of Newark, N.J.*, 148 F.2d 337, 338 (6th Cir. 1945) (per curiam). Summary judgment may be appropriate when the evidence "incontrovertibly establishes fraudulent intent," *Esparza for Cortez v. Citizens Ins. Co. of the Midwest*, No. 17-14132, 2020 WL 1083713, at *3 (E.D. Mich. Mar. 6, 2020), which may occur if the insurance claim is an intentional misrepresentation "on its face" and if evidence "directly and specifically contradicts representations made in the [claim,]" *Bahri v. IDS Prop. Cas. Ins. Co.*, 864 N.W.2d 609, 612–13 (Mich. Ct. App. 2014). Courts have declined to find that intentional misrepresentation occurred in summary-judgment cases even when an insurer produces surveillance footage that refutes an insured's claims, when witnesses' sworn statements contradict the claims, or when the claims include major misrepresentations. *See, e.g.*, *Esparza*, 2020 WL 1083713, at *3; *Daniels v. Esurance Prop. & Cas. Ins. Co.*, No. 17-10209, 2018 WL 2321214, at *5–6 (E.D. Mich. May 22, 2018); *Thomas v. State Farm Mut. Auto. Ins. Co.*, No. 17-CV-10558, 2018 WL 5719994, at *2 (E.D. Mich. Nov. 1, 2018). Put simply: under Michigan law, only extraordinary facts merit summary judgment on the question of intent.

Construing the record in the light most favorable to Meat Town, as we must, I believe that there is enough evidence to create a genuine dispute of material fact about intent. Whether Meat Town intentionally misrepresented the amount of meat delivered from Kap's Wholesale ("Kap's") is a close call; the disparity between the hundreds of cases of meat claimed and the amount of food

27

delivered on November 10 raises our eyebrows. But the record sways me. Meat Town manager Alan Gluck's declaration and Kap's controller Allen Cohn's deposition buoy Meat Town's assertion that the store asked for copies of current invoices, Kap's faxed over the two November 10 invoices, and Meat Town attached these two copies to its summary of loss. R. 22–14 (Gluck Decl. at 3) (Page ID #1352); R. 28-2 (Cohn Dep. at 12–13) (Page ID #1516–17).

Other record evidence might explain why Meat Town's summary of loss specified where the meat cuts were placed in the store. Several of Claims Consultant International ("CCI") adjustor Michael Stabley's photos depict glass-covered cuts of meat in counters and a box of unidentifiable meat in a back room. R. 15-25 (Photos) (Page ID #344–57).[1] Meat Town owner Peter Demopolis explained how Meat Town's staff usually unloaded deliveries from Kap's and customarily put specific meat cuts in certain places. R. 15-9 (Demopolis Dep. at 124–26, 171) (Page ID #168–71). Possibly, Meat Town—or CCI on behalf of Meat Town—estimated where each cut was located by relying on the invoices that Kap's sent over, their knowledge of how Kap's deliveries were routinely unloaded, their understanding of how certain cuts were usually distributed around the store, and the photographs depicting glass-covered meat in counters and a box of meat in a back room. In alignment with Michigan law, there is a genuine issue of material fact about Meat Town's intent.

Whether Meat Town intentionally misrepresented details about meat sourced from Quality Meats & Culinary Specialties ("Quality") is a similarly close question. Meat Town does not dispute the district court's finding that the burglary summary of loss lists $8,739.03 worth of goods from Quality on November 7 and 10, 2015. Appellant's Br. at 9. Although Quality's CEO Jeff Davis admitted that Quality sold to Meat Town the claimed product, R. 28-3 (Davis Dep. at 9–10)

---

[1] Notwithstanding the district court's valiant effort to distinguish spare rib tips from loin back rib, *see Meat Town v. Sentinel Ins. Co.*, No. 17-13801, 2019 WL 5445831, at *4 n.1 (E.D. Mich. Oct. 24, 2019), we courts are not butchers. These photos should be presented to expert witnesses who can identify what kind of meats are portrayed in these images.

28

(Page ID #1547–48), he swore that Quality did not deliver these goods in November 2015, R. 15-22 (Davis Aff. at 2) (Page ID #326). Sentinel asks us to compare the photocopies of carbon copies of bills of lading that Meat Town submitted to Sentinel, which lack dates, with Quality's high-definition colorized copies, which include dates but are otherwise identical to Meat Town's submissions. Appellee's Br. at 27–28.

The mysterious absence of the dates from Meat Town's photocopies is wholly suspicious, and I do not ignore the possibility that Meat Town may have physically removed the dates from its submissions. *Compare* R. 28–9 (Quality Copies) (Page ID #1614–16), *with* R. 15-18 (Burglary Loss Summ. at 32–35) (Page ID #249–52). But, again, we must construe the record in the light most favorable to Meat Town. Davis admitted that it is "possible," although "not likely[,]" that there was no date of delivery on the invoice that Quality turned over to Meat Town and that he was not "a hundred percent sure" who filled out the invoices. R. 28-3 (Davis Dep. at 14) (Page ID #1552). When asked "how long a gap is there between when you send out the invoice and the delivery date[,]" Davis responded:

> "[W]e normally don't do things this way. This is something I would do with Meat Town because we wouldn't invoice something unless we were sure he was keeping it. . . . [W]e wouldn't charge him for something unless he was keeping it. So, I mean, it could be within a few days. It could be within a few weeks. Whenever they went through it and decided what they were going to keep. So I can't be a hundred percent sure as to when this product was shipped over there being that there's no date on here."

*Id.* at 14–15 (Page ID #1552–53). Davis stated that "most likely there would be a date on [the bill] of the *original delivery date*." *Id.* at 14 (Page ID #1552) (emphasis added). Davis also acknowledged that Quality issued an invoice to Meat Town that is dated October 30, 2015. *Id.* at 13 (Page ID #1551); R. 27-6 (Oct. 30 Invoice at 1) (Page ID #1493). Davis's deposition reveals that Meat Town might have purchased the claimed products on October 30, for which Quality issued an invoice and a dateless bill of lading. The deposition shows that Quality possibly

delivered the meat on November 10 and someone in Quality's office may have written the date of delivery, i.e., November 10, on their original copy of the bill. Because the evidence presents a colorable explanation for why Meat Town's copies of the bills of lading lack dates that are present on Quality's copies, I cannot conclude at the summary-judgment stage that Meat Town intentionally or recklessly misrepresented the date of purchase for meats sourced from Quality.[2]

In short, because a genuine dispute of material fact exists about Meat Town's recklessness and intent, the district court erred in granting summary judgment to Sentinel. I respectfully dissent.

---

[2] I also fail to see how Meat Town's misrepresentations can be considered material at the summary-judgment stage. Under Michigan law, questions of materiality are generally for jury determination, *see Westchester Fire Ins. Co. v. Hanley*, 284 F.2d 409, 415 (6th Cir. 1960); *Samuels v. Allstate Prop. & Cas. Ins. Co.*, 310 F. Supp. 3d 847, 869 871 (E.D. Mich. 2018), and are intertwined with questions of intent, *see West*, 259 N.W.2d at 557. "When the alleged misrepresentation comes down to a disparity between the true value of the damaged property and the value claimed by the insured, Michigan courts will submit these cases to a jury so long as the claimant has a 'plausible non-fraudulent explanation' for the disparity—even if the disparity is rather large." *Sinkfield v. State Farm Ins.*, 580 F. App'x 323, 326–27 (6th Cir. 2014) (quoting *West*, 259 N.W. 2d at 558). Summary judgment may be proper if there is an "extreme" disparity between the "actual value of the property and the claimed value of the property" and if an insured person refuses to provide an explanation for the disparity despite pressure to do so. *Id.* at 327; *see also Flowers v. IDS Prop. Cas. Ins. Co.*, No. 10-CV-15164, 2012 WL 5906728, at *5 (E.D. Mich. Nov. 26, 2012). Here, Meat Town's claims for meat sourced from Kap's and Quality are only 5.7% of the combined burglary and arson claims. *Cf. West*, 259 N.W.2d at 557 (determining that fraudulent claim constituting 4% of total claim was immaterial). Further, the supposed misrepresentation about the Quality products is the *delivery date*; the *amount delivered* is not contested. I can find no case in which a court that is applying Michigan law considered an insured's misreporting a delivery date to be a material misrepresentation. Absent such precedent, I would conclude that there is a genuine issue of material fact about materiality.