RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

K.V.G. PROPERTIES, INC.,

        *Plaintiff-Appellant*,

    *v.*

WESTFIELD INSURANCE COMPANY,

        *Defendant-Appellee*.

> No. 17-2421

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-11561—Avern Cohn, District Judge.

Argued: June 7, 2018

Decided and Filed: August 21, 2018

Before: SUTTON, McKEAGUE, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gavin J. Fleming, FLEMING YATOOMA & BOROWICZ PLC, Bloomfield Hills, Michigan, for Appellant. Kurt D. Meyer, GREGORY AND MEYER, P.C., Troy, Michigan, for Appellee. **ON BRIEF:** Gavin J. Fleming, FLEMING YATOOMA & BOROWICZ PLC, Bloomfield Hills, Michigan, Mayer Morganroth, MORGANROTH & MORGANROTH, PLLC, Birmingham, Michigan, for Appellant. Kurt D. Meyer, GREGORY AND MEYER, P.C., Troy, Michigan, for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. This insurance-coverage dispute began when some of KVG's commercial tenants got caught growing marijuana in their rental units. Unfortunately for

their landlord, the tenants caused substantial damage to the premises before the police caught up with them. KVG speedily evicted the tenants and sought coverage from its insurers for nearly $500,000 in related losses. Westfield denied the claims, prompting this lawsuit. The district court granted summary judgment to Westfield, reasoning that the damage was excluded by the policy, and KVG appeals. We **AFFIRM**.

## I

This case arises out of a standard first-party commercial insurance contract. The policy provides a broad range of coverage, from general physical damage insurance to a "fine arts floater." The policy is organized under multiple "Forms," each with their own insuring agreements, terms, and exclusions. The claim in this case arose under the *Building and Personal Property Coverage Form* ("BPP Policy"). Under this Form, Westfield agreed to pay for "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." For the purposes of KVG's claims, a "Covered Cause of Loss" is any "Risk[] Of Direct Physical Loss."

This generous insuring agreement is tempered by a litany of exclusions. One such exclusion states that Westfield "will not pay for loss or damage caused by or resulting from" any "[d]ishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose." The parties refer to this language as the Dishonest or Criminal Acts Exclusion.

With the basic terms of the policy out of the way, we turn to the facts of this case. KVG, a commercial landlord, leased several pieces of real property to a group of commercial tenants. KVG authorized the tenants to use the property for general office or light industrial business. On October 29, 2015, the U.S. Drug Enforcement Agency raided the premises and caught the tenants growing lots of marijuana. KVG speedily evicted the tenants, but the damage had already been done: To accommodate their "business," the tenants removed walls, cut holes in the roof, altered ductwork, and severely damaged the HVAC systems. The total cost of repair appears to be around $500,000.

KVG subsequently filed a claim with Westfield for insurance coverage.  After a kerfuffle between the parties' respective agents, Westfield denied the claim, finding that several exclusions applied.  KVG then sued Westfield for breach of the insurance agreement, and KVG removed the case to federal court.  *See* 28 U.S.C. §§ 1332(a)(1), 1441(a).  The district court found that the loss was excluded by the policy and granted Westfield's motion for summary judgment.  KVG appeals that order.  We have jurisdiction under 28 U.S.C. § 1291.

## II

We review de novo a grant of summary judgment based on the district court's interpretation of a Michigan insurance contract.  *Stryker Corp. v. XL Ins. America*, 735 F.3d 349, 354 (6th Cir. 2012).  The Michigan courts engage in a two-step analysis when determining coverage under an insurance policy: (1) whether the general insuring agreements cover the loss and, if so, (2) whether an exclusion negates coverage.  *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997).

The first step of the analysis requires little discussion.  The insuring agreements are written broadly to cover all "Risks of Direct Physical Loss."  Indeed, one would struggle to think of damage *not* covered by this language, and this is not a case that tests its boundaries.  It is abundantly clear that the property suffered physical damage, necessarily caused by some risk (or risks) of direct physical loss.[1]  The harder question is whether the risks here are not covered because an exclusion takes them off the table.

Westfield leads with the Dishonest or Criminal Acts Exclusion.  In sum, Westfield argues that KVG's tenants conduct was criminal under either state or federal law and that these acts

---

[1]KVG insists that the only relevant risk here is "vandalism" and therefore embarks on a quest to define that term.  But nowhere do the policy's relevant insuring agreements mention vandalism.  Even the Crime & Fidelity Form referenced by KVG at oral argument makes no mention of vandalism in its insuring agreements.  *See* R. 10-3, Commercial Crime & Fidelity Form § A.1–A.7, PID 398–99.  Instead, vandalism only appears in the policy's exclusions, in the exceptions to those exclusions, and in certain specific riders that do not relate to the subject matter of this case.  *Id.* § D.3.g, PID 401–02 (vandalism is an excluded loss for certain parts of the Crime & Fidelity Form); *id.*, Special Form § G.2, PID 263 (exception to an exclusion); *id.* § F.1, PID 263 (rider extending coverage for property in transit).  In any event, this is all irrelevant. The physical damage to the building is covered by the insuring agreements because of its very nature—regardless of whether it was a result of vandalism.

were the main cause of KVG's loss.  We agree.**2**  Therefore, we do not address the merits of the other exclusions argued by the parties, since the criminal acts here cover all of KVG's claims against Westfield.  *Hunt v. Drielick*, 852 N.W.2d 562, 566 (Mich. 2014) ("[C]overage under a policy is lost if any exclusion within the policy applies to an insured's particular claims.").

Under this exception, the core issue is whether the tenants committed a "criminal act" within the meaning of the policy.  In the abstract, this is an interesting question.  Cultivating marijuana is a crime under federal law, *see, e.g.*, 21 U.S.C. § 841(b)(1)(A)(vii), but it is protected by Michigan law under certain conditions, *see* Michigan Medical Marihuana Act ("MMMA"), I.L. No. 1 (2008), Mich. Comp. Laws §§ 333.26421–333.26430.

Under different circumstances, KVG might have a strong federalism argument in favor of coverage.  In diversity cases, we act as faithful agents of the state courts and the state legislature. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("There is no federal general common law.  Congress has no power to declare substantive rules of common law applicable in a state . . . .  And no clause in the Constitution purports to confer such a power upon the federal courts.").  Since the MMMA was passed by ballot initiative, we would exercise even more care, lest we (as unelected judges) tread directly on the will of the People of the State of Michigan, who cannot easily correct any error we commit.  Exercising the Michigan courts' common-law power to interpret public initiatives, we would hesitate before reading a Michigan insurance policy to bar coverage for a "criminal act" when Michigan law confers criminal and civil immunity for the conduct at issue.  Mich. Comp. Laws § 333.26424(b) (declaring that a person lawfully cultivating medical marijuana shall not be "subject to arrest, prosecution, or penalty *in any manner*, or denied *any right or privilege*" under state law) (emphasis added).  But we need

---

**2**We observe that the text of the Dishonest and Criminal Acts Exclusion includes two basic elements: (1) A dishonest or criminal act, (2) committed by a person in a specified role or by "anyone to whom you entrust the property for any purpose."  R. 10-3, Special Form § B.2.h, PID 257.  The list of roles does not include tenants, and there is some question about whether *this* exclusion should apply to someone who obtains "entrustment" by false pretenses.  *Compare id.* at § B.2.h *with id.* at § B.2.i (withholding coverage if the insured is induced to part with property by false pretenses).  However, KVG has expressly chosen not to discuss this element or argue it in favor of reversal.  *See* Reply Br. at 5 ("Importantly, whether the property is entrusted to the tenant is a question that the Court need not resolve . . . .").  Since we do not answer questions that "merely lurk in the record" and are not asked by the parties, we express no opinion on this issue.  *United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010).

not face that difficult issue today, because no reasonable jury could find that KVG's tenants complied with Michigan law.

Ultimately, the insurer bears the burden of proving facts showing that an exclusion applies. *Hunt*, 852 N.W.2d at 565. However, federal courts may grant summary judgment to the party with the burden of proof if any reasonable jury would return a verdict in that party's favor. *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056–57 (6th Cir. 2001). In such a case, there is no need for trial because the dispute is "so one-sided that one party must prevail as a matter of law." *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Faced with a properly supported motion for summary judgment, the non-movant may force a trial by "set[ting] forth specific facts showing that there is a genuine issue for trial," but its threadbare assertion of a material dispute does not make it so. *See Maben*, 887 F.3d at 263; *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 61 (6th Cir. 2007).

Here, the record contains evidence that KVG itself claimed, in Michigan court, that its tenants violated the law. In its eviction pleadings against each tenant, KVG repeatedly claimed that the "[t]enant illegally grew marijuana" in the unit and stated that the "[i]llegal growing of marijuana" was a "continuing health hazard." These pleadings were signed by KVG's lawyer, who sought and obtained immediate possession of the premises under Michigan's summary eviction statute. Mich. Comp. Laws § 600.5714(d) (permitting summary eviction in limited circumstances, including when the tenant is causing a "continuing health hazard"). Pleadings are binding legal documents that can be admitted as evidence against that party in subsequent proceedings. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000); Fed. R. Evid. 801(d)(2).

Furthermore, neither party disputes that federal agents raided the premises as part of a criminal investigation. At the time of the raids, federal officials were operating under guidance from the Deputy Attorney General stating that they should not prioritize "individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of marijuana." DAVID W. OGDEN, MEMORANDUM FOR SELECTED U.S. ATTORNEYS (Oct. 19, 2009); *see also* JAMES M. COLE, MEMORANDUM FOR U.S. ATTORNEYS (June 29, 2011).

Though the guidance did not purport to halt all federal inquiry into marijuana growing that complied with state law, it did set priorities for federal law enforcement's limited resources. Whether one agrees with these memoranda or not, we do not lightly presume that the DEA ignored them when deciding to raid KVG's property. Thus, the fact of the raid itself has some tendency to show that the tenants were not "in clear and unambiguous compliance" with Michigan law. *See id.*; Fed. R. Evid. 401.

Taken together, these facts are sufficient to meet Westfield's prima facie case of proving a criminal act by the preponderance of the evidence. It thus falls to KVG to identify record evidence suggesting that its tenants complied with the Michigan Medical Marihuana Act. *See Maben*, 887 F.3d at 263. It has not done so. Instead, KVG speculates that its tenants *could have been* complying with Michigan's marijuana laws. But it is well-established in our case law that a party may not avoid summary judgment by resorting to "speculation, conjecture, or fantasy." *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004); *see also Anderson*, 477 U.S. at 252–53 (requiring more than a "scintilla" of evidence). Trials exist to resolve concrete factual disputes, not to satiate the endless imagination of trial lawyers. In the absence of any evidence of legality, Rule 56 requires us to concede to Westfield's evidence of illegality.

One final matter deserves discussion. At oral argument, KVG took the position that Westfield could not invoke the Dishonest or Criminal Acts Exclusion unless the tenants had been convicted. KVG cited no authority for this assertion, and we cannot find any as well. The policy says "criminal act," not "crime" or "criminal conviction." A fugitive from justice may properly be deemed a criminal by the person he harms, even though the State cannot prove it beyond a reasonable doubt. We doubt the Michigan Supreme Court would read such an onerous "conviction requirement" into a standard commercial insurance contract, and we accordingly decline to do so in the complete absence of state authority providing otherwise.

### III

The policy's insuring agreements cover the damage here, but Westfield has proven that the Dishonest or Criminal Acts Exclusion applies. Therefore, the district court did not err in granting Westfield's motion for summary judgment, and we **AFFIRM** that decision.