NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0379n.06

Case No. 20-1498

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 05, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| PRIMEONE INSURANCE COMPANY, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| GRAND TRUMBULL, LLC, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: SUHRHEINRICH, McKEAGUE, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** After a fire damaged a building it owned in Detroit, Grand Trumbull, LLC filed an insurance claim with its insurer, PrimeOne Insurance Company. Grand Trumbull sought coverage in the amount of the property's actual cash value at the time of the fire, as opposed to the cost to replace the building. PrimeOne accepted liability. But the parties turned to the courts to resolve whether Grand Trumbull's payout should be reduced due to its purported failure to satisfy the policy's coinsurance provision. The district court held that the coinsurance provision was satisfied and granted judgment in Grand Trumbull's favor. We now affirm.

I.

A. Grand Trumbull purchased a commercial insurance policy from PrimeOne. *See* Appendix. The policy language (section E.4.a) explained that should Grand Trumbull file a claim

for damage to property covered by the policy, PrimeOne would "determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition . . . or any applicable provision which amends or supersedes the Valuation Condition." The Valuation Condition (section E.7) defines "the value of the Covered Property in the event of loss or damage" as the "actual cash value as of the time of loss or damage."

In addition to coverage for the property's actual cash value at the time of loss or damage, Grand Trumbull's policy (section G.3) also included replacement cost coverage. Replacement cost insurance is generally understood "to cover the difference between what a property is actually worth and what it would cost to rebuild or repair that property." 15A Couch on Insurance § 176:56 (3d ed. 2021). While the policy afforded Grand Trumbull the option to elect replacement cost reimbursement in the event of loss or damage, Grand Trumbull nonetheless could "make a claim for loss or damage . . . on an actual cash value basis instead of on a replacement cost basis," and, if it did so, it could "still make a claim for the additional [replacement cost] coverage" within 180days of the loss or damage. PrimeOne, however, would "not pay on a replacement cost basis for any loss or damage . . . [u]ntil the lost or damaged property is actually repaired or replaced."

The policy also included a coinsurance provision (section F.1) that served to penalize Grand Trumbull should it fail to maintain adequate coverage at the time it experienced a covered loss. The provision reads: "If a Coinsurance percentage is shown in the Declarations," PrimeOne "will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property." In the event Grand Trumbull did not possess sufficient coverage at the time of loss, PrimeOne could reduce Grand Trumbull's recovery according to a formula specified in the policy. *See* Appendix.

B. After a fire damaged its building, Grand Trumbull filed a claim seeking coverage based on the property's actual cash value (rather than the property's replacement cost). PrimeOne accepted liability, and the parties agreed that the actual cash value at the time of the fire was $723,357.67. But they disputed (and continue to dispute) whether the policy's coinsurance penalty applied, which, if applicable, would reduce the amount owed to Grand Trumbull.

Based upon the declarations page included in the policy (reproduced in relevant part below), the parties agreed that the policy set a 90% coinsurance condition, had a $1.3 million claim limit in the event of loss or damage to the building, and used the term replacement cost (as reflected by the indication "RC") in the "Valuation" column.

| Coverage | Limit of Insurance | Valuation | Co-Ins | Covered Cause of Loss | Theft | Deductible | Premium |
|---|---|---|---|---|---|---|---|
| Building | $1,300,000 | RC | 90% | Special | Yes | $2500 | Included |

PrimeOne interpreted the policy to require that Grand Trumbull's coinsurance obligation always be measured by reference to the building's replacement cost. For support, PrimeOne pointed to policy language stating that if replacement cost coverage is "shown as applicable in the Declarations, . . . Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition." Using an estimate of approximately $2.15 million for replacement cost, PrimeOne contended that Grand Trumbull was underinsured and subject to a penalty because its $1.3 million limit is less than $1.935 million ($2,150,000 x 90%). PrimeOne thus penalized Grand Trumbull and, in accordance with the coinsurance penalty formula, paid Grand Trumbull only $482,149.63 for the loss.

Grand Trumbull responded that the coinsurance determination must be based on the property's actual cash value, as that was the nature of the claim it submitted. On that front, the

parties agreed that if the coinsurance requirement is calculated using actual cash value, Grand Trumbull would not be subject to a coinsurance penalty.

When the parties failed to resolve their dispute, PrimeOne sought a declaratory judgment that Grand Trumbull's coinsurance obligation be calculated using replacement cost. Grand Trumbull responded by seeking a declaratory judgment of its own, requesting a ruling that its coinsurance obligation be measured using actual cash value. Following the parties' filing of cross-motions for summary judgment, the district court ruled in Grand Trumbull's favor. The court held that Grand Trumbull's coinsurance obligation should be derived using the building's actual cash value, not its replacement cost, given that Grand Trumbull was seeking only an actual cash value payout. And because Grand Trumbull maintained sufficient coverage based upon the building's actual cash value, no coinsurance penalty applied. The district court therefore awarded Grand Trumbull $238,708.04—the difference between the actual cash value ($723,357.67) and the amount PrimeOne already paid ($482,149.63), minus the deductible ($2,500)—plus interest.

II.

With the parties' dispute now before us, we review the district court's resolution of the parties' respective cross-motions for summary judgment de novo. *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016); *see also K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 821 (6th Cir. 2018) (reviewing de novo a district court's summary judgment decision interpreting a Michigan insurance contract). Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The parties agree that Grand Trumbull's policy is governed by Michigan law. In Michigan, an insurance policy is viewed as a contract between the insurer and the insured. *Hunt v. Drielick*,

852 N.W.2d 562, 565 (Mich. 2014). Accordingly, we must "determine what the agreement was and effectuate the intent of the parties." *Id.* (quoting *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433 (Mich. 1992)). In so doing, we interpret the policy's terms "in accordance with Michigan's well-established principles of contract construction." *Am. Tooling Ctr., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 895 F.3d 455, 459 (6th Cir. 2018) (quoting *Citizens Ins. Co. v. Pro-Seal Serv. Grp., Inc.*, 730 N.W.2d 682, 685 (Mich. 2007)). Chief among them, we enforce an insurance contract "in accordance with [its] terms." *Mich. Battery Equip., Inc. v. Emcasco Ins. Co.*, 892 N.W.2d 456, 458 (Mich. Ct. App. 2016). That means the policy "should be read as a whole and must be construed to give effect to every word, clause, and phrase." *Id.* (quoting *McGrath v. Allstate Ins. Co.*, 802 N.W.2d 619, 621 (Mich. Ct. App. 2010)). When a term is unambiguous, we "must construe and apply [it] as written." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). At the same time, when an aspect of an agreement is "capable of conflicting interpretations," thereby rendering it "ambiguous," Michigan courts typically construe the ambiguity in favor of the insured. *Pioneer State Mut. Ins. Co. v. Dells*, 836 N.W.2d 257, 262–63 (Mich. Ct. App. 2013).

A. That takes us to the crux of today's dispute: the policy's coinsurance provision. Generally speaking, coinsurance provisions require an "insured to maintain coverage to a specified value of the property," which serves to divide risk between the insurer and the insured. 15 Couch on Insurance § 220:3 (3d ed. 2021). Failing to maintain such coverage makes the insured "a coinsurer" who then bears a "proportionate part of the loss." *Id.*

Under the policy's coinsurance provision, Grand Trumbull was required to maintain coverage of at least 90% of the "value of [the] Covered Property at the time of loss" to avoid being subject to a penalty. The coinsurance provision, however, does not specify whether "value" refers

to the property's actual cash value or replacement cost. And that distinction, as previously noted, makes a difference. If, as Grand Trumbull argues, "value" means "actual cash value," then Grand Trumbull was sufficiently coinsured. But if, as PrimeOne argues, "value" means "replacement cost," then Grand Trumbull was underinsured and thus subject to a penalty. While a close call, we believe Grand Trumbull has the better view.

Taking the policy "as a whole," *Mich. Battery Equip., Inc.*, 892 N.W.2d at 458 (citation omitted), we begin with the Valuation Condition in section E.7. The Valuation Condition provides that PrimeOne "will determine the value of Covered Property in the event of loss or damage . . . at actual cash value as of the time of loss or damage." As a default consideration, then, the Valuation Condition, and in turn the coinsurance provision, defines "value" as "actual cash value." *See Buddy Bean Lumber Co. v. Axis Surplus Ins. Co.*, 715 F.3d 695, 698 (8th Cir. 2013) (interpreting the same industry standard policy at issue here); *Wenrich v. Emps. Mut. Ins. Cos.*, 132 P.3d 970, 976 (Kan. Ct. App. 2006) ("If the optional coverage had not been declared, the coinsurance provision would be interpreted consistent with the valuation provision to require use of 'actual cash value.'").

Yet the definition of "value" can be amended by the replacement cost provision. When applicable, the replacement cost provision (section G.3.a) alters the definition of "value" in the Valuation Condition to "replacement cost." And the Valuation Condition, in turn, gives meaning to the term "value" in the coinsurance provision. *See Wenrich*, 132 P.3d at 976. According to PrimeOne, when Grand Trumbull elected to purchase replacement cost coverage, that action forever changed the term "value" in the coinsurance provision to mean "replacement cost" in all instances.

PrimeOne's interpretation, however, is in tension with the thrust of the neighboring policy provisions (sections G.3.c and G.3.d) concerning Grand Trumbull's right to seek coverage for actual cash value. *See Mich. Battery Equip., Inc.*, 892 N.W.2d at 458 (explaining a policy must be "construed to give effect to every word, clause, and phrase" (citation omitted)). Those provisions preserve Grand Trumbull's ability to file a claim either (1) "on an actual cash value basis instead of on a replacement cost basis," or (2) for replacement cost coverage after amending its initial selection or in the first instance. Replacement cost coverage, in fact, is not even available to Grand Trumbull unless and until it "actually repair[s] or replace[s]" its property. Together, these provisions preserve Grand Trumbull's right, even after adding replacement cost coverage to its policy, to select a payout in the amount of the property's actual cash value. And with Grand Trumbull maintaining the right to seek either an actual cash value or replacement cost payout, "value" necessarily depends on the type of claim filed.

A contrary reading—one that would deem Grand Trumbull's decision to add replacement cost coverage to "automatically change how to calculate the coinsurance provision"—would significantly undermine Grand Trumbull's entitlement to file an actual cash value recovery. *Buddy Bean*, 715 F.3d at 700. Replacement cost, by definition, is always higher than actual cash value. *Melson v. Prime Ins. Syndicate, Inc.*, 429 F.3d 633, 635 n.3 (6th Cir. 2005) ("Actual cash value is the replacement cost minus normal depreciation."). Understandably, Grand Trumbull's policy required it to obtain greater coverage (or be penalized) in exchange for the right to seek a larger payment based on replacement cost. Yet it is difficult to believe that the policy also contemplated penalizing Grand Trumbull for not obtaining that same level of coinsurance even when it merely pursued an actual cash value claim. Grand Trumbull's $1.3 million in coinsurance was sufficient to meet the policy's 90% requirement as to claims seeking actual cash value. But it was insufficient

for a claim for replacement cost, with that cost estimated between $1.88 million and $2.15 million. Calculating the coinsurance penalty using replacement cost value—even when Grand Trumbull submitted an actual cash value claim—would essentially make "irrelevant" Grand Trumbull's right to file an actual cash value claim. *Buddy Bean*, 715 F.3d at 700. We decline to read that right out of the policy.

This understanding fairly honors the agreement struck by the parties. *See Hunt*, 852 N.W.2d at 565. From PrimeOne's perspective, it took on increased risk by providing replacement cost coverage, which offered Grand Trumbull a greater potential recovery than did actual cash value coverage, subject to a penalty should Grand Trumbull fail to coinsure at the required level. *See Melson*, 429 F.3d at 635 n.3. But because Grand Trumbull filed an actual cash value claim, the downside of PrimeOne's risk (higher liability) will not be realized. And from Grand Trumbull's perspective, it chose to include replacement cost as a coverage option beyond the policy's default provision of actual cash value coverage. Had Grand Trumbull elected a payout based upon the property's replacement cost, PrimeOne fairly could have required Grand Trumbull to maintain greater coinsurance in accordance with the covered property's replacement cost (and penalize them for not doing so). *See State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apartments, L.C.*, 572 F.3d 511, 516–17 (8th Cir. 2009) (interpreting "value" in the coinsurance provision of an identical policy to refer to replacement cost when the insured filed a replacement cost claim); *Wenrich*, 132 P.3d at 975 (same). Were that not the case, Grand Trumbull would receive a windfall—it would get the benefit of a more generous replacement cost recovery without the increased costs of additional coinsurance. On the flip side, by electing not to utilize its replacement cost coverage, Grand Trumbull reasonably expected that it could still obtain the full benefit of the policy's actual cash value coverage. The policy, it bears noting, offered no express warning to

Grand Trumbull that purchasing additional replacement cost coverage would undermine its ability to recover on an actual cash value basis. *See Buddy Bean*, 715 F.3d at 700 ("If [the insured's] decision to buy replacement cost coverage would automatically change how to calculate the coinsurance provision, the insured would always suffer a substantial coinsurance penalty even on actual cash value claims . . . ."). Nor did PrimeOne modify the contract (when Grand Trumbull added replacement cost coverage) expressly to foreclose the possibility that the coinsurance requirement could be measured by actual cash value. *Cf. Melson*, 429 F.3d at 635 (modifying the coinsurance provision of a similar policy to expressly require the insured to maintain coverage based on replacement cost value); *Royal Prop. Grp., LLC v. Prime Ins. Syndicate, Inc.*, 706 N.W.2d 426, 430 (Mich. Ct. App. 2005) (same). Understanding the meaning of "value" in the coinsurance provision to depend on the type of claim filed thus honors the parties' expectations, as reflected by their agreement. *See Buddy Bean*, 715 F.3d at 697, 699–700 (interpreting identical policy language and holding that "the proper interpretation of the coinsurance provision depends on whether the insured has filed an actual cash value claim or a replacement cost claim"); *Wetmore v. Unigard Ins. Co.*, 107 P.3d 123, 127 (Wash. Ct. App. 2005) (explaining that "an insured's exercise of the right to elect the type of claim made affects the pertinent value" of property for purposes of the coinsurance provision).

B. PrimeOne offers several arguments in rebuttal. First, it rejects *Buddy Bean*, where the Eighth Circuit, in interpreting an identical policy, explained that the insured's "choice to purchase a type of expanded coverage was not intended to vitiate its basic coverage." 715 F.3d at 700. PrimeOne counters that Grand Trumbull's policy did not include "basic" or "baseline" actual cash value coverage, and thus PrimeOne was not obligated to "ignore coinsurance and pay 100% of an insured's [actual cash value] loss or claim." *See Melson*, 429 F.3d at 639–40 (holding that fire

insurance policies in Michigan, which must provide at least actual cash value coverage, Mich. Comp. Laws § 500.2883(1)(a), may be subject to a coinsurance condition that decreases an insured's recovery if the insured is insufficiently coinsured). But Grand Trumbull's policy does, in a sense, provide "baseline" actual cash value coverage, even if that baseline is subject to a coinsurance obligation. Absent optional coverage, the policy only provides actual cash value coverage. And even with the addition of replacement cost coverage, the policy offers the policyholder a choice: "actual cash value *instead of* replacement cost or actual cash value *in addition to* replacement cost." *Wetmore*, 107 P.3d at 127. Either way, the starting point is actual cash value.

Next, PrimeOne points to a table in the policy's declarations that indicates "RC" (or "replacement cost") in a column labeled "Valuation," and "90%" in an adjacent column labeled "Co-Ins." Yes, as PrimeOne observes, the policy requires that the replacement cost provision applies when "shown as applicable in the Declarations." But the "RC" notation does not vanquish the policy's plain text providing the option to recover on an actual cash value basis. Nor does it declare how the coinsurance obligation should be calculated. *See Royal Prop. Grp., LLC*, 706 N.W.2d at 433–34. Consider the facts of *Royal Property*. There, a table in a similar policy's declarations listed "ACV" in the "Valuation" column and "80%" in the "Coins %" column, whereas the coinsurance provision was expressly based on the "replacement cost value of [the] Covered Property." *Id.* at 430, 433. That apparent conflict did not create an ambiguity because the declarations provided "no basis to assume that the parties intended that coinsurance would be based on the ACV of the property." *Id.* at 434. Rather, "[t]he headings and respective entries . . . are separated by columns, and there is no indication on the policy application that the 'ACV' entry supplements the 'Coins %' heading." *Id.* at 433–34.

*Royal Property*, we acknowledge, is not squarely on point—the policy showed "ACV," rather than "RC," in the declarations. But as other courts have concluded, a replacement cost notation in the declarations is insufficient to show that "value" in the coinsurance provision is measured using replacement cost. In *Buddy Bean*, the policy's declarations also showed that the insured "paid for optional replacement cost coverage as part of its policy." 715 F.3d at 699; *see also Buddy Bean Lumber Co. v. Axis Surplus Ins. Co.*, No. 6:11-CV-6078, 2012 WL 13027347, at *4 n.8 (W.D. Ark. July 10, 2012) (noting the declarations contained an "X" next to "Replacement Cost" in the "Optional Coverages" section). The court nonetheless held that the insured's coinsurance obligation was based on actual cash value when it filed an actual cash value claim. *Buddy Bean*, 715 F.3d at 699–700. So too in *Kielbania v. Indian Harbor Insurance Co.*, where a table in a policy's declarations with "RC" and a coinsurance percentage "simply reflect[ed] the relevant elections as to two separate policy provisions: coinsurance and optional replacement cost." No. 1:11CV663, 2012 WL 3957926, at *8 (M.D.N.C. Sept. 10, 2012), *adopted*, 2012 WL 6554081 (M.D.N.C. Dec. 14, 2012). The notations were "listed in separate columns," according to the court, "to convey the elections that will apply with respect to each of these separate Policy provisions." *Id.* As a result, there was "nothing in the Declarations to connect the coinsurance percentage to only replacement cost valuation." *Id.* (citing *Royal Prop. Grp., LLC*, 706 N.W.2d at 433–34).

PrimeOne's remaining authority is distinguishable. The courts there used replacement cost to calculate the coinsurance provision either because the insured filed a replacement cost (rather than actual cash value) claim, *see State Auto Prop. & Cas. Ins. Co.*, 572 F.3d at 516–17; *Wenrich*, 132 P.3d at 975, or because the policy at issue included a coinsurance provision that explicitly referenced the "replacement cost value of Covered Property," *see Melson*, 429 F.3d at 635; *Royal*

*Prop. Grp., LLC*, 706 N.W.2d at 435; *see also Howard Indus., Inc. v. Ace Am. Ins. Co.*, No. 2:13-cv-0067, 2014 WL 978445, at *11, *14 (S.D. Ohio Mar. 12, 2014) (interpreting a different policy's coinsurance provision that expressly referred to replacement cost). Those cases, in other words, are unlike this one.

## CONCLUSION

For the foregoing reasons, the district court's judgment is affirmed.

**APPENDIX: Relevant Policy Provisions**

E.  Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

. . .

    4.  Loss Payment

        a.  In the event of loss or damage covered by this Coverage Form, at our option, we will either:

            (1) Pay the value of the lost or damaged property;

            (2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;

            (3) Take all or any part of the property at an agreed or appraised value; or

            (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

        We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

    . . .

    7.  Valuation

    We will determine the value of Covered Property in the event of loss or damage as follows:

        a.  At actual cash value as of the time of loss or damage . . .

. . .

F.  Additional Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions

    1.  Coinsurance

    If a Coinsurance percentage is shown in the Declarations, the following condition applies.

    a.  We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.  Instead, we will determine the most we will pay using the following steps:

        (1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

        (2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

        (3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

        (4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example #1 (Underinsurance)**

When: The value of the property is: $250,000

The Coinsurance percentage for it is: 80%

The Limit of Insurance for it is: $100,000

The Deductible is: $250

The amount of loss is: $40,000

Step (1): $250,000 x 80% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000/$200,000 = 0.50

Step (3): $40,000 x 0.50 = $20,000

Step (4): $20,000 – $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example #2 (Adequate Insurance)**

When: The value of the property is: $250,000

The Coinsurance percentage for it is: 80%

The Limit of Insurance for it is: $200,000

The deductible is: $250

The amount of loss is: $40,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

. . .

G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

. . .

3. Replacement Cost
   a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition in this Coverage Form.
   b. [Exclusions not relevant here]
   c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.
   d. We will not pay on a replacement cost basis for any loss or damage:
      (1) Until the lost or damaged property is actually replaced; and
      (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.